EDMUND F. STEINER, GEORGE F. ADAMS, DAVID B. GREENE, GEORGE ROBBINS, MEMBERS OF THE BOARD OF EDUCATION OF THE MILFORD SPECIAL SCHOOL DISTRICT, RAYMON C. COBBS, SUPER-INTENDENT OF THE MILFORD SPECIAL SCHOOL DISTRICT, and M. ALEXANDER GLASMIRE,

*Appellants,*

*vs.*

LILLIAN SIMMONS, an infant, by her Guardian ad Litem, Perry A. Reese, MADELINE STATEN, an infant, by her Guardian ad Litem, Elenora Staten, ANNIE RUTH THOMPSON, an infant, by her Guardian ad Litem, Cassie Lee Thompson, EDNA TURNER, an infant, by her Guardian ad Litem, Millicent Turner, IRENE PETTY-JOHN, an infant, by her Guardian ad Litem, Naomi Waples, CHARLES FLEMING, JR., an infant, by his Guardian ad Litem, Charles Fleming, Sr., KENNETH BAYNARD, an infant, by his Guardian ad Litem, Garland Baynard, ORLANDO CAMP, an infant, by his Guardian ad Litem, Gertrude C. Pennewell, EUGENE HARRIS, an infant, by his Guardian ad Litem, Thomas Harris, ROLAND VANN, an infant, by his Guardian ad Litem, Catherine Vann, PERRY A. REESE, ELENORA STATEN, CASSIE LEE THOMP-SON, MILLICENT TURNER, CHARLES FLEMING, SR., GARLAND BAYNARD, GERTRUDE C. PENNEWELL, THOMAS HARRIS, CATHER-INE VANN, and NAOMI WAPLES,

*Appellees.*

*Supreme Court, On Appeal, February 8, 1955.*

*Howard E. Lynch, Jr.,* Dover, for appellants.

*Louis L. Redding,* Wilmington, for appellees.

*William Prickett,* Wilmington, for American Civil Liberties Union, *amicus curiae.*

*John J. Morris, Jr.,* Wilmington, *amicus curiae* by appointment of the court.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice, for the court: On September 8, 1954 eleven Negro pupils were admitted to the Milford High School, a public school established under Delaware's school segregation laws for white children only. On September 30, 1954 they were dropped solely because of their race and color. Ten of them filed suit in the Court of Chancery to compel readmittance, and moved for a preliminary mandatory injunction. The Vice Chancellor held that they had been lawfully enrolled in the school and that their legal right to attend the Milford High School was clear. He therefore awarded the injunction, holding that he must preserve the legal *status quo* that he found to eixst prior to their expulsion. See 34 *Del.Ch.* 593, 108 *A.2d* 173. The Board of Education of the Milford Special School District appeals.

The deplorable incidents preceding the removal of the children from the school, and the widespread publicity that inevitably followed, have had the effect, we think, of obscuring the essential question in the case. That question is simply this: Did the Board of Education of the Milford Special School District have the right to admit these Negro children? If it did, they have the right to remain there. If it did not, they have no legal status which the Court of Chancery was required to protect, and they were not entitled to remain there.

The argument upon the Board's motion to stay the Vice Chancellor's order left us with a doubt whether the plaintiffs had been legally admitted to the school. Because of this doubt we granted the stay, since it is a well settled principle of equity that a preliminary mandatory injunction will not issue unless the legal right to be protected is clearly established. *Tebo v. Hazel, (Del.Ch.)*, 74 *A.* 841, and cases cited; *Nebeker v. Berg*, 13 *Del.Ch.* 6, 115 *A.* 310; *cf. Cooling v. Security Trust Co.*, 29 *Del.Ch.* 286, 49 *A.2d* 121.

We have now heard argument upon the merits. In addition to counsel for plaintiffs and for the Milford Board, we have had the assistance of a brief and argument on behalf of plaintiffs by counsel for the American Civil Liberties Union, *amicus curiae*, and a brief and argument by John J. Morris, Jr., Esquire, *amicus curiae* appointed by the court to file an opposing brief.

We are now convinced that the doubt we expressed on the argument of the motion for a stay was well founded.

Our conclusions are:

▮ I. The opinion of the Supreme Court of the United States in the Segregation Cases has the present effect of nullifying our segregation laws; but the opinion does not require, *immediate* desegregation of the public schools. Until the mandate of the Supreme Court of the United States is received, the State *may* take immediate steps toward desegregation; it is not compelled to do so at the moment.

▮ II. The State Board of Education of this State, during the past summer, promulgated regulations directing the local boards to submit plans looking to gradual integration in the public schools. These *regulations* require the approval of the State Board of any such plan, and forbid attempts at desegregation without such approval. They have the force of law throughout the State. The Board of Education of the Milford School District disregarded these regulations, and in admitting the Negro pupils to the school acted without authority of law.

The considerations that have led us to these conclusions follow.

To review the correctness of the Vice Chancellor's decision, we must first inquire: Does the opinion of the Supreme Court of the United States in the Segregation Cases [1] confer upon the Negro children the present right to be admitted to the school?

▮ If it does, there is an end of the case. The Constitution of the United States is the supreme law of the land, and its interpretation by the Supreme Court of the United States is the law binding upon all of us.

The answer to the question is not so easy as it might appear. It is, of course, beyond doubt that the Supreme Court has ruled that segregation in the State public schools is unconstitutional and must

---

1. *Brown v. Board of Education of Topeka*, 347 *U.S.* 483, 74 *S.Ct.* 686, 691, 98 *L.Ed.* 873.

go. The question decided in the *Brown* case was stated by the Chief Justice as follows:

"Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?"

The court answered this question in the affirmative. It also said:

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment."

The court, however, did not enter any decree in the cases. Its opinion continues as follows:

"Because these are class actions, because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity. On reargument, the consideration of appropriate relief was necessarily subordinated to the primary question—the constitutionality of segregation in public education. We have now announced that such segregation is a denial of the equal protection of the laws. In order that we may have the full assistance of the parties in formulating decrees, the cases will be restored to the docket, and the parties are requested to present further argument on Questions 4 and 5 previously propounded by the Court for the reargument this Term. The Attorney General of the United States is again invited to participate. The Attorneys General of the states requiring or permitting segregation in public education will also be

permitted to appear as *amici curiae* upon request to do so by September 15, 1954, and submission of briefs by October 1, 1954."

Questions 4 and 5, referred to in the court's opinion, are these:

"4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

"(a) would a decree necessarily follow providing that, within the limits set by normal geographic school districting, Negro children should forthwith be admitted to schools of their choice, or

"(b) may this Court in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?

"5. On the assumption on which questions 4(a) and (b) are based, and assuming further that this Court will exercise its equity powers to the end described in question 4(b),

"(a) should this Court formulate detailed decrees in these cases;

"(b) if so, what specific issues should the decrees reach;

"(c) should this Court appoint a special master to hear evidence with a view to recommending specific terms for such decrees;

"(d) should this Court remand to the courts of first instance with directions to frame decrees in these cases, and if so what general directions should the decrees of this Court include and what procedures should the courts of first instance follow in arriving at the specific terms of more detailed decrees?"

Argument upon these questions was set for December 6, 1954, but has been continued because of the absence of a full court. 23 *L.W.* 3141.

A preliminary question must be dealt with. What is the *present* effect of this opinion upon state school segregation laws?

On behalf of the plaintiffs and of the American Civil Liberties Union it is urged that the opinion has the immediate effect of nullifying them; that under the rule of *stare decisis* the opinion declares the law, and the fact that no mandate or decree is entered is of no consequence. The Milford Board replies that the opinion is not yet effective because the case is still before the court on the question of relief. As counsel for the Board puts it, there is a "moratorium" period during which the segregation laws remain in force.

It is quite true that a judicial opinion is not a judgment; it states the reasons for the judgment. It settles no rights between the parties to the litigation, and cannot be the basis for a claim of *res judicata*. There is a difference between an "opinion" and a "decision", though the words are often used interchangeably. *Rogers v. Hill*, 289 *U.S.* 582, 588, 53 *S.Ct.* 731, 733, 77 *L.Ed.* 1385.

But it does not follow that the opinion has no effect upon the law. In stating the reasons upon which the judgment rests the court declares the law. The law thus announced becomes a precedent. It must be followed by any inferior court. This function of the judicial opinion is inherent in our system of jurisprudence. *Pound, The Theory of Judicial Decision,* 36 *Harv. L.Rev.* 940; 1 *Cooley, Constitutional Limitations,* 111-118.

All this is elementary. It is restated because of the contention that the postponement of the question of relief has in some way impaired the force of the Brown opinion as law. It is true that so long as an opinion may be subject to reargument and change its authority may be less compelling. But this qualification has no force here. The opinion in the Segregation Cases was unanimous. It was handed down after full reargument. Nothing remains before the court but the question of relief.

Moreover, the court itself has treated the opinion as final. On May 24, 1954 it vacated lower court judgments in three cases pending before it involving various aspects of segregation, saying in each case:

"The judgment is vacated and the case remanded for consideration in the light of the Segregation Cases decided May 17, 1954, * * * and conditions that now prevail." [2]

In *Arnold v. Kirkwood School District R-7*, 213 F.2d 535, 536, the Court of Appeals for the Eighth Circuit had before it a district court decision involving the "separate-but-equal" doctrine as applied to public education. It reversed the judgment below, saying:

"* * * Brown v. Board of Education of Topeka and the companion cases thereof—popularly referred to as the Segregation Cases—347 U.S. 483, 74 S.Ct. 686 [98 L.Ed. 873], have now rendered moot legally any consideration of whether separate schools, which have been provided, constitute equal facilities in fact, as the measure of equal protection under the Fourteenth Amendment.

"For this reason, the judgment in this case is vacated, and the cause is remanded for such further consideration or other proceedings as may be appropriate or necessary, if any, in the situation existing, as related to the decision in the Segregation Cases."

In *Board of Public Instruction of Manatee County v. State of Florida, Fla.,* 75 So.2d 832, the Supreme Court of Florida had before it the question of the validity of a bond issue to raise money for the building and equipment of separate white and Negro public schools. The court held the bonds valid on the ground that a long period of time will be required to bring about desegregation in Florida, and in the interim educational facilities must be provided. The court's opinion appears to recognize the *Brown* decision as final.

In two recent cases in Maryland and the District of Columbia the courts have regarded the opinion in the *Brown* case as final and binding and have refused to interfere with the progress of desegregation in the public schools. *Sabine v. Sharpe, (D.C.D.C., Sept.* 9, 1954).

---

2. *State of Florida ex rel. Hawkins v. Board of Control of Florida,* 347 *U.S.* 971, 74 *S.Ct.* 783, 98 *L.Ed.* 1112; *Muir v. Louisville Park, etc., Ass'n,* 347 *U.S.* 971, 74 *S.Ct.* 783, 98 *L.Ed.* 1112; *Tureaud v. Board of Supervisors,* 347 *U.S.* 971, 74 *S.Ct.* 784, 98 *L.Ed.* 1112.

*Burr v. Sondheim,* (*Super. Ct., Balto. City, Oct.* 5, 1954). The same view of the effect of the opinion has been expressed by the Attorney General of Missouri.[3]

■ We think that the opinion in the Segregation Cases is a final one. Its necessary present effect is to nullify the provisions of the Delaware Constitution and statutes requiring separate schools for whites and Negroes.

But does it follow from this conclusion that the Negro children have an immediate right to be admitted to "white" schools? To put it in another way, has the Supreme Court of the United States said that the states with school segregation laws *must* proceed with de-segregation *at the present time?*

Upon these questions the counsel for the plaintiffs and for the American Civil Liberties Union are not entirely in accord. For the plaintiffs, it is said that their rights under the Fourteenth Amendment are "personal and present". *State of Missouri ex rel. Gaines v. Canada,* 305 *U.S.* 337, 59 *S.Ct.* 232, 83 *L.Ed.* 208; *Sipuel v. Board of Regents,* 332 *U.S.* 631, 68 *S.Ct.* 299, 92 *L.Ed.* 247; *Sweatt v. Painter,* 339 *U.S.* 629, 70 *S.Ct.* 848, 94 *L.Ed.* 1114. Hence it is argued that the plaintiffs now have an immediately enforceable right to be admitted to the Milford High School, the only high school in Milford Special School District, within the boundaries of which they reside. For the American Civil Liberties Union it is argued that the rights of the plaintiffs to be admitted are constitutional rights, but it is suggested that a Court of Chancery may "temper" the enforcement of these rights by weighing the equities. This argument is not developed in the brief and we are uncertain how far it is intended to go. In the view we take of the case, it is unnecessary to consider it.

We recur to plaintiffs' contention that under the *Brown* decision the plaintiffs have a constitutional right immediately enforceable.

The situation is an unusual one. The right to unsegregated education has been established. The plaintiffs in the Segregation Cases, and the plaintiffs in this case, now have that right. But as to the plain-

---

3. Opinion of the Honorable John M. Dalton, Attorney General, June 30, 1954, to the State Board of Education of the State of Missouri.

tiffs in the Segregation Cases the enforcement of that right has been deferred. The Supreme Court of the United States has not entered a decree directing immediate admittance. On the contrary, it has postponed for further argument and consideration the very question whether the plaintiffs before it are entitled to immediate relief. This it has not decided. The cases before it now are class actions; not, as in the *Gaines, Sipuel and Sweatt* cases, individual actions. The opinion indicates that the decree to be entered will deal with the rights of all Negro school children in the states subject to the decree, not as individuals, but as members of a class. How, then, can such rights be held to be "personal and present" at this moment?

The questions propounded for argument suggest that the court may give serious consideration to plans for "gradual adjustment" from a segregated system to a desegregated one. It would be presumptuous for us to speculate upon what the court will do. We say only that when its decision is made, it may or may not accord immediate relief; at the moment it has withheld such relief from the plaintiffs before it. By implication, it has indicated that the states affected may withhold immediate relief from others similarly situated. This seems to us to be the necessary effect of the court's opinion. If the plaintiffs in the Segregation Cases have no immediate right to demand admittance upon a non-segregated basis, how can the plaintiffs before us be in better case? Suppose, for example, that the plaintiffs in the Delaware case [4] had been denied relief, and themselves had appealed to the Supreme Court of the United States. They would at the moment be awaiting the mandate. Would the plaintiffs now before us have a right superior to those already before the court? Such a result appears illogical.

The effect of the decision in the Segregation Cases seems to us to be this: The Supreme Court of the United States has determined a right to exist, but has not yet determined the remedy. Until that remedy shall be fixed, the right is not a present enforceable one. States having segregation laws are not required, *at the moment,* to desegregate their schools. Whether desegregation shall proceed in this interim is a matter for the proper state authorities to determine.

4. *Gebhart v. Belton (Belton v. Gebhart), 33 Del.Ch.* 144, 91 *A.2d* 137.

We are of opinion that the Board of Education of the Milford Special School District was not compelled by the *Brown* decision to admit the plaintiffs to the Milford High School.

Nevertheless, the Milford Board did admit them. Did it have authority to do so?

This is a question of state law, since the *Brown* decision did not, we think, enlarge the administrative or policy-making powers of the state's school boards under state law. It merely removed a barrier to the exercise of those powers.

Upon the handing down of the *Brown* decision the state authorities were confronted with two important questions: Should desegregation be attempted at once, or should it be deferred until receipt of the mandate of the Supreme Court of the United States? If desegregation was to be undertaken, how and when was it to be brought about?

The first question requires a determination of state policy. The political and social implications of integration in the schools need no elaboration. In Delaware, opinion is divided upon the issue. Until the Supreme Court of the United States has issued its mandate, this fact has to be taken into account by the educational authorities.

As to the second question, administrative difficulties are presented. The question is no longer solely one of admitting some Negro pupils to white schools, as it was under the "separate-but-equal" doctrine. It is one of changing an entire segregated school system to a system of "mixed" schools—a problem of considerable magnitude. The district system of public schools in Delaware is built around segregation, and it is complex. Exhibit 1 to the Attorney General's brief now before the Supreme Court of the United States sets forth a maze of white school districts, colored school districts, special school districts, and "attendance areas". There are special schools for "Moors or Indians". 14 *Del.C.* § 141. The boundaries of the white and colored school districts are different. Neither the State Board of Education nor the local boards may change these boundaries. Consolidation requires a referendum to the voters, or (in the case of ordinary districts) consent of the property owners affected. 14

*Del.C.* §§ 1105-1108. Most of the schools in the white districts are supported in part by local taxation. Except in Special School Districts the colored schools are supported wholy by the State. The administrative problems are such that the State Board has indicated that legislation will be necessary to accomplish complete integration throughout the State. Presumably the matter will be fully presented to the Governor and to the General Assembly, now in session, in the Board's annual report required by 14 *Del.C.* § 127.

Despite these administrative difficulties (which, we suspect, are not always sufficiently appreciated), the State Board of Education determined to make a beginning. By the school laws of the State it is vested with general policy-making power, and with authority to adopt rules and regulations for the administration of the public school system.

In 14 *Del.C.* § 121, it provided:

"The Board shall exercise a general control and supervision over the public schools of the State, including—

\*       \*       \*

"(2) The determination of the educational policies of the State \* \* \*".

In § 122 it is provided:

"(a) The Board shall adopt rules and regulations for the administration of the free public school system which, when prescribed and published, shall be binding throughout the State."

The local boards have no such broad powers. As to an ordinary district, it has no policy-making powers; and its administrative powers are quite limited. 14 *Del.C. Ch.7.* Special School Districts have general powers of administration, 14 *Del.C.* § 902, but their power to determine policy is subject to the general provisions of the school laws, and any such determination must be "in accordance with the rules and regulations of the State Board of Education". 14 *Del.C.* § 941.

Let us examine what the State Board, in the exercise of its powers, undertook to do.

The Segregation Cases were decided on May 17, 1954. On June 9th the Attorney General addressed a letter to the President of the State Board of Education with respect to the decision. He expressed the view that the *Brown* opinion "nullifies our constitutional provision and its statutory counterpart providing for separate but equal educational facilities." He also said:

> "The opinion is not a self-executing one and does not call for immediate integration. It is possible for any school district, however, where circumstances permit and the situation warrants, to effect integration consonant with the law of the land as now announced by the recent Supreme Court opinion without doing violence to the Constitution and laws of our own State, notwithstanding the fact that the mandate of the United States Supreme Court has not yet been handed down.

> "On the other hand, the State Board of Education may well require time within which to bring about integration in an orderly fashion within the spirit and meaning of the recent Supreme Court decision. I am sure that the Board will formulate some concrete plan directed towards an effective gradual adjustment from existing segregation in the public schools in Delaware to a system of non-segregation in accordance with the spirit, purpose and intent of the opinion as expeditiously as it is possible for it to do so."

Acting upon this advice the State Board at a special meeting held June 11th, formulated and announced a policy looking to gradual desegregation of the public school system so far as permitted under existing law. The Board said:

> "As a general policy, the State Board of Education fully intends to carry out the mandates of the United States Supreme Court decision as expeditiously as possible. It is recognized that communities differ one from the other in tradition and attitudes; therefore, the actual carrying out of the integrative process will require a longer period of time in some parts of the State than in others."

To carry out this general policy, the Board adopted the following regulations:

"A. Since the Wilmington School authorities have indicated that they are in a position to move promptly in the direction of integration, the necessary permission for embarking upon this program is hereby granted the Wilmington Board of Education.

"B. It is the considered opinion of the State Board of Education that the school authorities together with interested citizen groups throughout the State should take immediate steps to hold discussions for the purpose of (1) formulating plans for desegregation in their respective districts and (2) presenting said plans to the State Board of Education for review.

"C. The State Board of Education will examine proposed programs of integration in light of the following considerations:

"1. School Districts

"a. There are many items of legislation which must be prepared in order to effect these changes and immediate plans are being made to prepare such legislation for presentation to the General Assembly of 1955, for example the elimination of Negro districts as they now exist and their assimilation into taxing units already existing or later to be created.

"b. The State Board of Education intends to make every effort possible within the limits of existing legislation not only to avoid the creation of educationally unsound units, but also to promote as far as possible the formation of larger and more efficient administrative units.

"2. Attendance Areas

"a. Economy requires the continued use of many of the school buildings now existing in the State.

"b. In all districts atendance areas are to be fixed by the local school authorities under regulations to be established by the State Board of Education.

"3. School Construction

"a. The State Board of Education must reappraise the need for the construction of certain schools or additions for some districts authorized under the 1953 School Construction Act, but these and similar ones will be approved by the State Board of Education if and when the local school authorities submit plans showing the place of such construction in an over-all educational program for the community.

"b. The necessity of proceeding with some of these plans as rapidly as possible is recognized because of the local school census data, but the State Board of Education will insist upon having, in at least outline form, a plan for the use of such additional facilities before approving further construction."

On August 19th the Board promulgated additional regulations as follows:

"In the policy statement regarding the problem of desegregation issued by the State Board of Education it was clearly stated that all school districts should immediately take steps to develop plans for desegregation.

*"No pupils, except* those *with proper transfer* permits shall be accepted by any school from other schools unless and until plans from that school for desegregation in that area have been approved by the State Board of Education.

*"In September 1954 all busses will run as usual* and all teachers will appear at their regular posts except in those cases where approved plans for desegregation have been made effective with the required administrative or organizational changes.

"Since the United States Supreme Court will hear further arguments sometime in October to help that Court find the best means of carrying out its decree, the State Board requests that *all schools,* maintaining four or more teachers, present a *tentative plan* for desegregation in their area on or before *October 1, 1954.*

"These plans will be considered tentative only, unless otherwise indicated by the school authorities."

On August 26th the Board issued another statement, in which the local boards were asked to present their proposals or report the status of their studies not later than October 1st. The statement of August 26th listed a large number of suggestions "designed as a guide to local boards in arriving at a proposal for ending segregation in the respective school districts". These suggestions deal with the desirability of consultation between the local board and lay and professional groups in the district in formulating the plan; with the desirability of permitting a pupil to complete the grade group in which he is enrolled; and with legal and administrative problems growing out of the State's complex system of school districts and attendance areas.

The purport and effect of these regulations and suggestions are clear. The Board recognizes that local sentiment with respect to the integration in the schools differs in different parts of the State. The Board also recognizes that serious administrative difficulties will be met in attempting to change the school system from a segregated to a desegregated one, and that for some purposes legislation may be required.

In the light of these considerations the Board has determined (1) that any steps toward integration must be embodied in a plan to be devised by the local board; (2) that any such plan must be submitted to the State Board for consideration and approval; (3) that no pupil may be accepted by any school from other schools until the desegregation plan has been approved.

No attempt is made by the State Board to force immediate desegregation upon any local board. Joint action is required. The somewhat loosely-knit educational system of the State, with administrative and policy-making powers divided between state and local authorities, and the system of elective local boards prevailing in Kent and Sussex Counties (and in a few districts in New Castle County), obviously make such joint action advisable—if not, indeed, necessary.

Since the adoption of these regulations considerable progress toward desegregation has been made. Exhibit 7 to the Attorney General's brief sets forth a "Report of Approved Plans for Desegregation and Pupils Involved." It shows that in the City of Wilmington

and in eight school districts of New Castle County nearly 3,000 Negro pupils are attending white schools, and ten white pupils are attending the Negro high school in Wilmington. The Dover high school for white pupils has been desegregated in the academic program. We are justified in inferring that the State Board's policy has proved to be a workable one.

We think, therefore, that these regulations are reasonable, and (if we may say so) embody a commendably wise and cautious approach to a problem of great delicacy and difficulty. Studies of desegregation in the public schools show that it is "an uneven shifting process, not a sudden massive change." Williams and Ryan, "Schools in Transition", 1954. Authority for the regulations is found in the statutes above quoted, which confer power upon the State Board to make educational policy, and divide administrative powers between the Board and the local boards. Indeed, the power of the State Board to adopt them (the constitutional question apart) is not assailed in this case. Having been adopted, they have the force of law, and are binding upon all local boards.

Now, the Board of Education of the Milford Special School District completely disregarded or overlooked these regulations. So far as shown by the record before us, no desegregation plan was ever proposed or submitted to the State Board prior to the admission of the Negro pupils to the high school. Plaintiffs' affidavits do not indicate that the board made any attempt to comply with the requirements or suggestions of the State Board's regulations. Whether the events that followed were attributable to disregard of the State Board's directives one cannot know. The fact is that in a few days public feeling in the community against the Milford Board's action became so bitter that the high school was closed, and remained closed during the week beginning September 20th. On September 23rd the State Board and the Milford Board held a joint meeting at Dover to consider the action of the Milford Board in enrolling the Negro pupils. The advice of the Attorney General had been sought. On September 23rd he gave the following opinion to the State Board:

"At the conference called by the Governor held in my office yesterday afternoon, I was asked whether the Board of the

Milford Special School District had acted within the law in admitting the eleven Negro children to the white school in its district. My answer was and is in the affirmative.

"In so doing, the Milford Special School District did not violate any constitutional provision, Federal or State, or any State law.

"Furthermore, a discussion of the facts with regard to the facilities of the Negro school and the white school in the district, apart from the unanimous expression of opinion by the United States Supreme Court which declared that segregation of and by itself makes for inequality, made it apparent that the facilities were not equal and, consequently, the Board of the Milford Special School District in refusing the Negro pupils admission to the white schools would have violated our State constitutional provision, as well as its statutory counterpart, providing for separate but equal education in the secondary schools, assuming that the laws and decisions of the State Supreme Court in connection with this matter is still in force until such time as the Mandate in the United States Supreme Court has been handed down.

"Finally, on either count, first, under the United States Supreme Court Opinion, which nullifies our constitutional provision and its statutory counterpart with regard to the separate but equal doctrine in secondary education in our State, since it contravenes the Federal Constitution, and, secondly facilities not being equal under our own State law and its judicial decisions, the Board of the Milford Special School District acted in accordance with the law of this State and the law of the land in admitting the eleven Negro pupils to the white school in its district."

The State Board, not without reason, found inconsistency between these views and the Attorney General's opinion of June 9th. After consideration of the whole matter in executive session, the Board announced its decision as follows:

"Acting upon the advice of the Attorney General given on June 9, 1954, that the State Board could take the time required

to bring about integration in an orderly fashion pending the mandate of the Supreme Court of the United States in the segregation cases, the State Board of Education on June 11th, August 19th, and August 26th of this year, issued statements of policy requiring that local boards of education submit to the State Board for approval their plans for integration before putting such plans into effect.

"It is evident that the Milford Board of Education overlooked the State Board's directives in admitting eleven Negro students without prior approval of the State Board. On this state of facts, it would appear that the Milford Board exceeded its authority.

"However, in an opinion dated September 23, 1954, the Attorney General stated that the Milford Board would have violated the Constitution and laws of the State of Delaware had it refused admission to the students in question. It does not appear from the Attorney General's opinion of September 23, 1954, whether he considered his former advices and the directives of the State Board made pursuant thereto.

"As a consequence, the State Board does not know at this time whether its directives to local boards, including the Milford Board, or the Attorney General's opinion of September 23, 1954, represent the proper interpretation of existing law.

"Accordingly, the State Board will immediately ask the Governor to request an advisory opinion of the Supreme Court of Delaware, and, pending receipt of such opinion, directs that the Milford Public School reopen on Monday, September 27, 1954, and that no transfers of students now enrolled be made until their legal rights are determined by proper judicial authority.

"The State Board of Education calls upon all persons concerned to await, with it, a determination of this question in the fair American way."

The advisory opinion of the members of this court upon the matter was never requested by the Governor, possibly because of the

obvious difficulty in bringing the question at issue within the scope of the statute relating to advisory opinions. 10 *Del.C.* § 141.

After the meeting of September 23rd the members of the Milford Board resigned, and a new Board assumed office. The Negro pupils remained in the school. Hostile public demonstrations increased. Racial feeling ran high and threats of violence were made. School attendance dropped to one-third of normal and the educational program of the school was disrupted.

On September 30th the Negro pupils were dropped from the rolls. On October 2nd the State provided bus transportation for them to the Henry High School in Dover. The pupils refused this and are now attending the Jason High School in Georgetown. Transportation is provided by the State.

This lamentable sequence of events suggests the importance of adherence by the local boards to the spirit and letter of the State Board's regulations. The Milford Board members no doubt acted in good faith and from high motives, but the hard fact remains that with the best of intentions they exceeded their powers under the law.

Now, the change of policy inherent in the action of the Milford Board was found by the Attorney General to be legally justified. But his opinion of September 23rd does not deal with the legal bearing upon the matter of the State Board's regulations respecting desegregation. It merely states that in admitting the Negro children to the school the Milford Board "did not violate any constitutional provision, Federal or State, or any State law." The reference to State law appears to be to the segregation laws; at all events the important questions above discussed are not noticed.

The Attorney General's opinion also finds, as a matter of law, that because of the factor of travel the high school facilities are not equal. But the effect of the *Brown* decision is to abolish the " 'separate but equal' " doctrine, which "in the field of public education * * * has no place." *74 S.Ct. 692.* Separate facilities, it has now been determined, are inherently unequal. The question now is when and how the separation is to cease, and this problem is not met by invoking

a doctrine now discredited. The question of equality of facilities is moot. *Arnold v. Kirkwood School District R-7, supra.*

The Vice Chancellor was of opinion that the lack of approval by the State Board of the action of the Milford board was of no legal significance. See the footnote to his opinion at 34 *Del.Ch.* 593, 108 *A.2d* 174. He did not discuss the matters that appear to us to be controlling, and we are compelled to disagree with his finding.

Before concluding this opinion we must notice some objections directed by plaintiffs to the construction of the language of the State Board's regulations.

It is said that the Board's statements were not clear or explicit, and particularly that they did not specifically prohibit independent action by the local boards. We do not agree. When read together, they leave no doubt that they were intended to be, and are, regulations requiring joint action by the State Board and the local boards in bringing about integration. The statement of August 19th expressly forbids the acceptance by any school of pupils from other schools until plans for desegregation have been approved by the State Board. Plaintiffs suggest that the regulation refers only to transfers from one district to another and that no "transfer" was technically involved because they were residents of the Milford district. This argument overlooks the fact that the high school "district" for Negro pupils is not the Milford Special School District, but an attendance area including Sussex County, so that a "transfer" could be said to be required.[5] But, aside from that, the important thing is that the State Board's directive of August 19th was clearly and specifically a reiteration of its position that State Board approval of a desegregation plan was a prerequisite to any local action.

It is said that much of the content of these statements is in the form of "suggestions" that the Board was powerless to enforce, for example, the suggestion for consultation by the local boards with

5. It might be said that the system of segregated districts with different boundaries must fall with the segregation laws. No doubt this will eventually come about; but again, the complete effectuation of such a change must await legislation or the mandate from the Supreme Court of the United States.

"lay and professional groups". Even so, this does not affect the portions of the regulations that embody the positive requirement to submit a plan before acting. That requirement is the heart of the matter.

It is next said that a statement issued June 17th with respect to high school districts conflicts with the statement of June 11th relating to desegregation. Paragraph (2) of the June 17th statement reads in part:

"(2) *High School Attendance Areas:*

"The high school boundary lines established by the State Board of Education shall denote the secondary school attendance area for the high school located within these boundary lines. All secondary school children shall be expected to attend the high school located within that area in which the student resides unless a proper transfer has been granted by the State Superintendent."

The plaintiffs say that this means that the Negro children in the Milford District (for example) are expected to attend the high school in that district. What is referred to is an "attendance area", which, in their case, is Sussex County. On its face, the statement has nothing to do with desegregation. It could not have been intended to change, and does not change, the prior directive of June 11th.

At the argument some mention was made of the State Board's ruling that the plaintiffs should remain in the Milford school until the legality of their status should be authoritatively determined. We are not certain what use plaintiffs seek to make of this circumstance, since the point is not developed on the brief. It is clear to us that this ruling was not an approval of plaintiffs' admittance; it was a determination to hold a ruling in abeyance pending an authoritative decision. After our decision upon the matter, any question arising from the ruling becomes moot.

It is finally said that the reason assigned by the Milford Board for plaintiffs' removal—the prevention of disorder—is insufficient in law. Grant that this is so. Certainly the appearance of yielding to threats of violence was most unfortunate. But this circumstance cannot affect the right and duty of the new Milford Board to comply with

the regulations of the State Board. If its action was correct, it must be upheld, whatever reason was assigned for it.

## Conclusion.

For the reasons above set forth, we are of opinion that the admittance of the plaintiffs to the Milford High School was contrary to law. They acquired no legal status in the school, and the injunction was therefore erroneously issued. This conclusion makes it unnecessary to consider the Milford Board's contention that the plaintiffs' suit is premature because of failure to exhaust administrative remedies under 14 *Del.C.* § 944.

In remanding the cause, we add one observation. It seems probable that the record before us contains all the pertinent facts to arrive at a final disposition of the case; but of this we cannot be certain, and either party may elect to go to final hearing. We have thought it our duty to express our opinion upon the basic questions in the case on the basis of the record before us, apparently complete, rather than to reverse solely upon the ground that where a legal right is not clearly established a preliminary mandatory injunction will not issue. The case is one of great public interest and importance, and we think that the court below, the General Assembly, the educational authorities of the State, and the public are entitled to our views upon the merits. Moreover, a decision upon the merits on appeal from an injunctive order is proper in order to avoid the circuity of action incident to a second appeal. *Cf. Martin v. American Potash and Chemical Corporation, Del., 92 A.2d 295.*

The order of the court below of October 19, 1954 is reversed, and the cause is remanded with instructions to vacate the order and to take such further proceedings as may be appropriate and consistent with this opinion.