Stanley STAHL, Plaintiff,

v.

APPLE BANCORP, INC., Jerome R.
McDougal, Edward J. Brown, George V.
Comfort, Thomas E. Dewey, Jr., Grace
J. Fippinger, Roscoe C. Ingalls, Jr.,
Robert A. Kavesh, John L. Procope,
Richard J. Schwartz, Ralph A. Weller
and John E. Zuccotti, Defendants.

Richard KESSLER, Plaintiff,

v.

APPLE BANCORP, INC., Jerome R.
McDougal, Edward J. Brown, George V.
Comfort, Thomas E. Dewey, Jr., Grace
J. Fippinger, Roscoe C. Ingalls, Jr.,
Robert A. Kavesh, John L. Procope,
Richard J. Schwartz, Ralph A. Weller
and John E. Zuccotti, Defendants.

Court of Chancery of Delaware,
New Castle County.

Submitted: May 14, 1990.
Decided: May 17, 1990.
Revised: May 18, 1990.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, Esquire, and Edmund Johnson of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff. Shea & Gould, New York City, of counsel.

Thomas J. Allingham, II, John G. Day, Esquire, Robert A. Glen, and Karen L. Valihura of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants.

Norman M. Monhait of Morris, Rosenthal, Monhait & Gross, Wilmington, Ralph L. Ellis of Abbey & Ellis, New York City, for Richard Kessler.

## OPINION

ALLEN, Chancellor.

On March 28, 1990 Stanley Stahl, who is the holder of 30% of the outstanding common stock of Apple Bancorp, Inc. ("Bancorp"), announced a public tender offer for all of the remaining shares of Bancorp's stock. Mr. Stahl had earlier informed Bancorp's board of an intention to conduct a proxy contest for the election of directors to the company's board. On April 10 Bancorp's board of directors elected to defer the company's annual meeting, which it had intended to call for mid-May, and announced it would explore the advisability of pursuing an extraordinary transaction, including the possible sale of the company. Mr. Stahl filed this action on April 12.

The complaint seeks an order requiring the directors of Bancorp to convene the annual meeting of the stockholders on or before June 16, 1990.[1] The suit is not brought under Section 211 of the Delaware General Corporation Law which creates a right in shareholders to compel the holding of an annual meeting under certain circumstances. Rather, the theory of the com-

---

1. The complaint also seeks the invalidation of a recent amendment to Bancorp's shareholder rights plan. That issue has not been presented on this motion.

plaint is that the directors of Bancorp had intended to convene an annual meeting in May or June—and had gone so far as to fix April 17 as the record date for the meeting—but dropped that plan when it appeared that a proxy contest by plaintiff was likely to succeed. This change in plans is said, in the circumstances, to constitute inequitable conduct because it seeks to protect no legitimate interest of the corporation but is designed principally to entrench defendants in office.

Defendants are the members of the board of directors of Bancorp. They answer the complaint by saying that in not scheduling the 1990 annual meeting in the Spring of the year as has been the practice, they are behaving responsibly in the best interests of the corporation and its shareholders. They claim that their decision to delay the annual meeting was not a response to a proxy contest by plaintiff but was a response to the announcement of plaintiff's tender offer which they conclude is coercive and at an inadequate price.

While the relief sought at this time—the holding of an annual meeting—is the final relief sought in the complaint, the matter has not been presented on a motion for summary judgment, nor has testimony been offered at final hearing. The pending motion is rather one for a preliminary mandatory injunction.

I.

The facts as they appear from the affidavits and depositions are as follows.

Bancorp is a Delaware corporation headquartered in New York. Since September 29, 1989, Bancorp has been the holding company of Apple Bank for Savings ("Apple Bank"), a savings bank chartered in New York. Pursuant to a reorganization on that date, all outstanding shares of Apple Bank were converted into shares of common stock of Bancorp. As of December 31, 1989, Bancorp had $3.41 billion in total deposits, $3.84 billion in total assets and $253.8 million of stockholders' equity.

Bancorp's shares are listed on the New York Stock Exchange.

Each director of the company is named as a defendant. Mr. McDougal is chairman of the board and chief executive officer of the company. Mr. Brown is the company's president and its chief operating officer. All other directors of the company appear to be outside directors.

Mr. Stahl, who is Bancorp's largest shareholder, began acquiring shares of Apple Bank in 1986. Gradually he increased his holdings through open market purchases and privately negotiated transactions. Upon effectuation of the reorganization in September 1989, Stahl became the owner of approximately 20% of the then outstanding shares of Bancorp. By November 7, 1989, he owned approximately 30.3% of the outstanding Bancorp shares.[2] As Stahl's proportionate share of Bancorp stock rose above 20%, Bancorp's financial advisor, and a large stockholder, each expressed concern to Mr. McDougal that Stahl might obtain control of the company without paying a control premium.

On November 15, 1989, the company's board of directors met to consider what action, if any, should be taken with respect to Stahl's stock accumulation. Two proposals were suggested: negotiating a standstill agreement with Stahl and adopting a stock purchase rights plan (a "rights plan"). The board authorized the preparation of the rights plan.

On November 16, McDougal informed Stahl of the board's intention to adopt a rights plan. McDougal suggested that one way of addressing the situation might be for Stahl to make a bid for the entire company at book value. Mr. Stahl indicated that he was unwilling to do so.

On November 17, the board adopted the rights plan. Stahl responded on November 22, 1989, by delivering to the company a proposal to be submitted to a vote at the next annual meeting of stockholders, calling for an amendment to the company's bylaws increasing the number of directors of the company from 12 to 21. In the

**2.** In December, 1989, Stahl acquired shares of the company, increasing his stake to 30.6%.

proposal Stahl nominated 13 individuals (including himself) to be named to the board if his bylaw proposal were approved.[3] He nominated four individuals to be elected if his bylaw proposal were defeated. Later, Stahl stated in a Schedule 13D filing that he would solicit proxies in favor of his proposal and for the election of his nominees to the board. That filing also stated that, if elected, Stahl intended to recommend to the full board that the rights under the rights plan be redeemed and that the board evaluate the performance of management and make any changes it deemed necessary to improve overall management performance.

On March 19, 1990 the board fixed April 17, 1990 as the record date for determining the shareholders entitled to vote at the company's 1990 annual meeting. While no date for the annual meeting was fixed, it was anticipated that the meeting would be held in May 1990. Section 213 of the Delaware General Corporation Law provides that the record date for an annual meeting shall not be less than 10 or more than 60 days before the date the meeting is held. Thus, the latest date at which an annual meeting could be held with an April 17 record date would be June 16.

On March 28, 1990, Stahl commenced a tender offer to purchase any and all outstanding shares of common stock of the company at $38 cash per share.[4] The offer is conditioned upon the expansion of the company's board of directors to 21 members and the election of Stahl's 13 nominees to serve on the board. The offer is also conditioned upon the stock purchase rights being redeemed or Stahl otherwise being satisfied that the rights are invalid. It is not conditioned upon the tender of any minimum number of shares or the receipt of financing or the obtaining of any regula-

tory approvals. In his tender offer documents, Stahl reiterated his intent to solicit proxies in support of his proposal to expand the company's board and to elect his nominees as directors. He also expressed an intent to cash out non-tendering stockholders in a second step merger as soon as practicable after completion of the tender offer. He did not, however, commit to do that or to use his best efforts to assure that such a transaction would occur. The tender offer stated that it was possible that a second step merger might not be proposed.

On April 9 and 10, the company's board of directors held a special meeting. The company's proxy solicitor informed the board that it was likely if the board did not present the stockholders with an economic alternative to Stahl's offer that Stahl would prevail in a proxy fight by a significant margin.[5] The company received from its financial advisors a written opinion that Stahl's offer, which represented a 17% premium over the prior market price, was inadequate and unfair to the stockholders from a financial point of view. The financial advisors advised the board that greater value for the stockholders could be obtained through certain alternative strategies. They further advised the board that adequate exploration of those alternatives would require more time than was available before the meeting, if the record date stood at April 17.

The board resolved to recommend to Bancorp's stockholders that they reject Stahl's offer. It further resolved to withdraw the April 17 record date in order to allow itself more time to pursue alternatives to the Stahl offer. The directors decided that "it is not in the best interest of the company and its stockholders to hold the annual meeting until the company has

---

**3.** Apple has a staggered board. Under the company's certificate of incorporation and bylaws, only 4 seats are open for election this year. Thus, in order for Stahl to gain majority control of the board, the bylaw proposal must be approved.

**4.** The closing market price of Bancorp stock on March 27, 1990 was $32¼ (per share). On May 8, 1990, the shares closed at $43⅛.

**5.** This prediction was not based upon any specific count of proxies. No proxies had been sent to shareholders. Rather, the proxy solicitor apparently based this prediction on its interpretation of general market tendencies.

had a fair opportunity to explore and pursue alternatives to the Stahl offer which would enable the company to maximize stockholder value." These alternatives included the sale of the company or the merger of the company with another financial institution.

On May 9 Mr. Stahl sent out proxy solicitation materials to Bancorp's stockholders even though no meeting was at that time scheduled. The pending motion was presented on May 14.

## II.

Stahl asserts and it is not denied that defendants intended to hold Bancorp's 1990 annual meeting in May 1990. He claims that by requiring shareholders to submit matters to be voted upon at the annual meeting by November 1989 (which the board interpreted Bancorp's bylaws to do) and by fixing an April 17 record date, the defendants have initiated the proxy contest process. It is argued that the withdrawal of the record date is essentially a postponement of Bancorp's 1990 annual meeting, and that the postponement was effected in order to avoid the defeat the incumbent directors anticipated that they would suffer if the election of directors were held in May. Stahl argues that the board's action constitutes an impermissible manipulation of the corporate machinery having the effect of disenfranchising the company's stockholders and entrenching the incumbent directors. Stahl argues, citing *Blasius Industries, Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988), that the board is required to present a compelling justification for its actions in rescinding the April 17 record date. This plaintiff asserts it cannot do.

Defendants do not dispute that the board originally intended to hold the 1990 annual meeting in late May. They point out, however, that no meeting date had been set, and under neither 8 *Del.C.* § 211 nor Bancorp's bylaws, was one required until September of 1990. Thus, it is said, the board's withdrawal of the April 17 record date was not an action that impeded a shareholder vote. Defendants assert that unlike the actions struck down in *Blasius* and in *Lerman v. Diagnostic Data, Inc.*, Del.Ch., 421 A.2d 906 (1980), the withdrawal of the April 17 record date did not render a shareholder vote ineffective, but simply delayed it. Defendants assert that the record date was withdrawn not as a response to a proxy contest by Stahl, but rather as a response to Stahl's tender offer. The appropriate standard for evaluating the board's action, say defendants, is that articulated in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), *i.e.*, whether the board's withdrawal of the April 17 record date was a reasonable response to a reasonably perceived threat to corporate or shareholder interests. Defendants claim to have satisfied that standard.

## III.

▇▇▇▇ Generally, preliminary injunctive relief will be granted if plaintiff demonstrates that it is reasonably probable that he will succeed on the merits and that, if the requested relief is denied, he will suffer harm that is both irreparable and greater than the harm that would befall defendants if the relief is granted. *Ivanhoe Partners v. Newmont Mining*, Del.Supr., 535 A.2d 1334, 1341 (1987). Upon an application for mandatory preliminary relief, however, plaintiff must show more than a reasonable probability of success on the merits; he must clearly establish the legal right he seeks to protect or the duty he seeks to enforce. *Steiner v. Simmons*, Del.Supr., 111 A.2d 574, 575 (1955); *Kingsbridge Capital Group v. Dunkin Donuts, Inc.*, Del.Ch., C.A. No. 10907, Chandler, V.C., 1989 WL 89449 (Aug. 7, 1989) slip op. at pp. 8–9.

▇▇▇▇ Where plaintiff seeks not merely mandatory relief, but final relief—in the sense that a result after trial could not practically reverse the grant of preliminary relief—then absent an extraordinary circumstance, the court ought not to grant such relief where material facts are in substantial dispute. *City Capital Associates Limited v. Interco, Inc.*, Del.Ch., 551 A.2d 787, 795 (1988). Here an order requiring

that a meeting be held presently could not be effectively reversed some months hence after trial, even if on hearing the evidence a different result appeared required. At that time a change in board control may have occurred and substantial transactions may have been effectuated. Thus, I am constrained to conclude that in a case of this sort the existence of a substantial dispute concerning a material fact would preclude the grant of preliminary relief.

## IV.

■ Turning to the merits of plaintiff's claim that the directors' decision to postpone the annual meeting violated their fiduciary duties of loyalty owed to the corporation and its shareholders, one first confronts the question what is the appropriate legal standard against which the defendants' action is to be measured. Two approaches, which in the end become quite similar, are possible: the fiduciary duty analysis employed by cases dealing with board action designed to impact on the shareholder vote;[6] or the modified business judgment test of *Unocal* and later cases which apply its test to board actions taken in the face of a threat to corporate control. The first approach is treated in this section of this opinion; the second in the next, concluding section.

Plaintiff contends that the deferral of the annual meeting and the rescission of the record date together constitutes a direct and intended interference with the exercise of the shareholders' right of franchise. It is said that to be sustained this action requires the directors to establish a compelling justification, which, plaintiff asserts, defendants cannot do. Plaintiff invokes the authority of a series of cases in support of his position: *e.g., Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204 (1987); *Blasius Industries, Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988); *Gintel v. Xtra Corp.,* Del.Ch., C.A. No. 11422, Allen, C. (February 27, 1990) (oral ruling).

For the reasons that follow I am unable to accept plaintiff's argument. Explaining why this is so is helped by placing the "compelling justification" language of *Blasius Industries, Inc. v. Atlas Corp.,* which plaintiff invokes into its larger doctrinal context.

■ It is an elementary proposition of corporation law that, where they exist, fiduciary duties constitute a network of responsibilities that overlay the exercise of even undoubted legal power. Thus it is well established, for example, that where corporate directors exercise their legal powers for an inequitable purpose their action may be rescinded or nullified by a court at the instance of an aggrieved shareholder. The leading Delaware case of *Schnell v. Chris–Craft Industries, Inc.,* Del.Supr., 285 A.2d 437 (1971) announced this principle and applied it in a setting in which directors advanced the date of an annual meeting in order to impede an announced proxy contest.

■ Under this test the court asks the question whether the directors' purpose is "inequitable." An inequitable purpose is not necessarily synonymous with a dishonest motive. Fiduciaries who are subjectively operating selflessly might be pursuing a purpose that a court will rule is inequitable. Thus, for example, there was no inquiry concerning the board's subjective good faith in *Condec Corporation v. Lunkenheimer Company,* Del.Ch., 230 A.2d 769 (1967) where this court held that the issuance of stock for the principal purpose of eliminating the ability of a large stockholder to determine the outcome of a vote was invalid as a breach of loyalty. Nor was there such an inquiry in *Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.,* Del.Ch., 96 A.2d 810 (1953).

*Lerman v. Diagnostic Data, Inc.,* Del. Ch., 421 A.2d 906 (1980) is a case that explicitly expresses the view that ineq-

---

**6.** *See, e.g., Schnell v. Chris–Craft, Industries, Inc.,* Del.Supr., 285 A.2d 437 (1971); *Condec Corporation v. Lunkenheimer Company,* Del.Ch., 230 A.2d 769 (1967); *Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.,* Del.Ch., 96 A.2d 810 (1953); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906 (1980); *Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204 (1987); *Blasius Industries, Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988).

uitable conduct does not necessarily require an evil or selfish motive. There the court held a bylaw invalid in the situation before it where that bylaw would have precluded a shareholder from mounting a proxy contest. The court referred to the fact that the bylaw "whether designedly inequitable or not, has had a terminal effect on the aspirations of Lerman and his group." 421 A.2d at 912.[7]

Each of these cases dealt with board action with a principal purpose of impeding the exercise of stockholder power through the vote. They could be read as approximating a *per se* rule that board action taken for the principal purpose of impeding the effective exercise of the stockholder franchise is inequitable and will be restrained or set aside in proper circumstances.

Consistent with these authorities, in *Blasius* and in *Aprahamian* this court held that action designed primarily to impede the effective exercise of the franchise is not evaluated under the business judgment form of review:

> Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.

*Blasius,* 564 A.2d at 660. *See also Aprahamian,* 531 A.2d at 1207 ("The business judgment rule ... does not confer any presumption of propriety on the acts of the directors in postponing the annual meeting.") These statements are simply restatements of the principle applied in *Schnell. Blasius* did, however, go on to reject the notion of *per se* invalidity of action taken to interfere with the effective exercise of the corporate franchise; it admitted the possibility that in some circumstances such action might be consistent with the directors equitable obligations. It was suggested, however, that such circumstances would have to constitute "compelling justification," given the central role of the stockholder franchise.

Thus, *Blasius'* reference to "compelling justification" reflects only the high value that the prior cases had placed upon the exercise of voting rights and the inherently particularized and contextual nature of any inquiry concerning fiduciary duties. Neither it nor *Aprahamian* represent new law.

Thus the fundamental question when the motion is evaluated under these cases may be expressed as whether the defendants have exercised corporate power inequitably. In answering that question, it is necessary to ask, in the context of this case, whether they have taken action for the purpose of impairing or impeding the effective exercise of the corporate franchise and, if they have, whether the special circumstances are present (compelling justification) warranting such an unusual step.

In my opinion one employing this method of analysis need not inquire into the question of justification in this instance, for I cannot conclude that defendants have taken action for the primary purpose of impairing or impeding the effective exercise of the corporate franchise. I reach this conclusion understanding that the Bancorp board had planned to call the annual meeting of stockholders for May and that it changed that plan in response to the risk that the combination of the proposed Stahl proxy contest and tender offer would result in a change in board control and the sale of the company.

For these purposes I do not accept that the Stahl tender offer, conditioned on the outcome of a stockholder vote, would have a coercive effect on that vote, nor do I rest my opinion on the ground that a board may always postpone a meeting for a substantial period on the eve of an annual meeting if it concludes that it will lose a proxy contest and thus decides to authorize a

---

7. *See also AC Acquisition v. Anderson Clayton &* *Co.,* Del.Ch., 519 A.2d 103, 114–115 (1986).

significant new development, such as the sale of the company.[8]

Rather, I place my opinion on the narrow ground that the action of deferring this company's annual meeting where no meeting date has yet been set and no proxies even solicited does not impair or impede the effective exercise of the franchise to any extent. To speak of the effective exercise of the franchise is to imply certain assumptions concerning the structure and mechanism that define the vote and govern its exercise. Shares are voted at meetings; meetings are generally called as fixed in bylaws. While the refusal to call a shareholder meeting when the board is not obligated to do so might under some imaginable circumstance breach a fiduciary duty, such a decision does not itself constitute an impairment of the exercise of the franchise that sparked the close judicial scrutiny of *Schnell, Blasius,* etc.

In no sense can the decision not to call a meeting be likened to kinds of board action found to have constituted inequitable conduct relating to the vote. In each of these franchise cases the effect of the board action-to advance (*Schnell*) or defer (*Aprahamian*) a meeting; to adopt a bylaw (*Lerman*); or to fill board vacancies (*Blasius*)—was practically to preclude effective stockholder action (*Schnell, Blasius, Lerman*) or to snatch victory from an insurgent slate on the eve of the noticed meeting (*Aprahamian*). Here the election process will go forward at a time consistent with the company's bylaws and with Section 211 of our corporation law. Defendant's decision does not preclude plaintiff or any other Bancorp shareholder from effectively exercising his vote, nor have proxies been collected that only await imminent counting. Plaintiff has no legal right to compel the holding of the company's annual meeting under Section 211(c) of the Delaware General Corporation Law, nor does

he, in my opinion, have a right in equity to require the board to call a meeting now.

This view may be criticized as placing undue emphasis on the formal act of fixing the date of the annual meeting. However, that is an act of some dignity and significance. *See Gries v. Eversharp, Inc.,* Del.Supr., 69 A.2d 922 (1949). Once fixed that date may be postponed at least in some circumstances. *Compare MAI Basic Four, Inc. v. Prime Computer, Inc.,* Del. Ch., C.A. No. 10868 Hartnett, V.C., 1989 WL 63900 (June 13, 1989) with *Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204 (1987). But, while postponement of a noticed meeting will in some circumstances constitute an inequitable manipulation, I can in no event see that the franchise process can be said to be sufficiently engaged before the fixing of this meeting date to give rise to that possibility.

### V.

Thus, since I do not see the board's decision to defer the annual meeting to a later time in conformity with the company's bylaws and Section 211 as a decision that does threaten the legitimacy of the electorial process, I conclude that the propriety of that decision is to be measured by the permissive business judgment form of review. *See Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). This determination would ordinarily end the matter, practically speaking.

It is the case, however, that the decision to rescind the April 17 record date and defer the planned annual meeting was taken in response to the threat of losing a prospective proxy contest and the sale of the company that would, in these circumstances, result. It thus was a decision that arguably was taken within that zone in which the threat recognized by *Unocal,* 493 A.2d at 954 is present. Thus, I will assume for purposes of this motion that the intermediate form of business judgment review

---

8. *See Gintel v. Xtra Corp.,* Del.Ch., C.A. No. 11422, Allen, C. (February 27, 1990) (oral ruling) (board required to hold annual meeting close to the time set where, on the eve of the meeting, the board—upon receiving advice that it would lose the election—declared that the meeting would be postponed in order that it might find a buyer for and negotiate a sale of the company).

identified in *Unocal* is called for here. This form of review causes us to revisit in a different doctrinal setting the issue of justification eluded to above.

 Determination of this motion does not require elaborate exegesis on the *Unocal* precedent. *See Paramount Communications, Inc. v. Time Incorporated,* Del.Supr., 571 A.2d 1140 (1990). Generally, *Unocal* establishes an intermediate form of judicial review that when applicable introduces into business judgment discourse elements of the fiduciary duty analysis of such cases as *Schnell.* Here I will look only to *Unocal's* core inquiry: did the directors reasonably perceive a threat to a valid corporate or shareholder interest when they made the decision under review, and is the board's response a reasonable one in relation to that threat. I conclude both core elements of the *Unocal* test are satisfied here.

 In so concluding I do not accept the notion that the prospect that the shareholders might vote differently than the board recommends can alone constitute any threat to a corporate interest. Threats to legitimate interests may arise in a proxy contest setting, of course, (*see, e.g. MAI; Gintel*) but the prospect of losing a validly conducted shareholder vote cannot, in my opinion, constitute a legitimate threat to a corporate interest, at least if one accepts the traditional model of the nature of the corporation that sees shareholders as "owners." [9]

But the Bancorp board did not simply face a prospective proxy contest. Rather it faced a special situation in which the proxy contest was tied to a tender offer. In other words the shareholders were in effect to be asked to vote on the question whether the company should be sold to Mr. Stahl at $38 per share. This of course is not inappropriate, but it is a question of great significance. Were the directors to undertake to sell the company they would be obliged to act in an informed way. *See Barkan v. Amsted Industries, Inc.,* Del. Supr., 567 A.2d 1279, 1287 (1989); *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986); *City Capital Associates Limited v. Interco, Inc.* Del. Ch., 551 A.2d 787, 802–03 (1988). Where the shareholders are in effect to be asked to decide whether the company should be sold in a given transaction, the board may properly recognize the shareholders need for information, other than the market prices of their stock, relevant to that decision. The disaggregated shareholders are incapable of obtaining appropriate information on alternatives other than the Stahl proposal and the market for their stock; only the board can accomplish that task. Thus, the absence of relevant information, in my opinion, may reasonably be seen as posing a threat to the vote of the Bancorp shareholders in the particular context presented.

 The essence of the *Unocal* form of review is a judicial assessment of the proportionality of a response to a threat. Here the response to the threat was extremely mild. Thus, in this instance one need not focus finely on how great was the threat posed by the prospect of an early vote, in order to conclude that the board's response in delaying the annual meeting to a later time (consistent with the company's bylaws and Section 211) was reasonable under *Unocal.* To delay a meeting once called would constitute a more substantial question of disproportionality. As one moves closer to a meeting date and closer to the announced conclusion of a contested election, attempts to postpone a meeting would likely require a greater and greater showing of threat in order to justify interfering with the conclusion of an election contest. Thus, in this way, the "enhanced" business judgment form of review of *Unocal* and the non-business judgment review of *Schnell, Condec, Aprahamian,* and *Blasius* come in the con-

---

9. *See generally* Bratton, *The New Economic Theory of the Firm: Critical Perspectives From History,* 41 Stan.L.Rev. 1471 (1989); Comment, *State Takeover Statutes and Corporate Theory: The Revival of An Old Debate,* 64 N.Y.U.L.Rev. 806 (1989). If the law accepts some other model of the corporation, shareholder action through the vote might well be seen as constituting a threat to other corporate constituencies or to a distinctive corporate "entity."

text of action arguably affecting the voting process, to resemble each other. *See* *Shamrock Holdings v. Polaroid Corp.*, Del.Ch., 559 A.2d 278, 286 (1989). This, of course, is not surprising. What is new in *Unocal*—judicial review of board decisions under an "objective" standard—is old in cases dealing with explicitly self-interested transactions or actions designed to affect the vote.

As indicated above, inquiries concerning fiduciary duties are inherently particularized and contextual. It is probably not possible to work out rules that will be perfectly predictive of future cases involving claimed impediments to the shareholder vote. It is sufficient to express a reasoned judgment on the facts presented. This I have now tried to do. The application for a preliminary injunction will be denied.